**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK** **Docket No. 17-cv-02721 (JMA)(SIL)**
---------------------------------------------------------------------X
**SHAWN BURNS, KEVIN BIEN, and**
**BRIAN M. WISE, and all other similarly situated**
**Correction Officers,**

**Plaintiffs,**

**-against-**

**COUNTY OF NASSAU and EDWARD MANGANO,**
**in his Official Capacity,**

**Defendants.**
---------------------------------------------------------------------X

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Rhoda Y. Andors, Esq.
**Bee Ready Law Group, LLP**
*Attorneys for Defendants*
170 Old Country Road, Suite 200
Mineola, New York 11501
(516) 746-5599
randors@beereadylaw.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......... iii

PRELIMINARY STATEMENT .......... 1

RULE 56.1 STATEMENT OF MATERIAL FACTS .......... *attached*

SUMMARY JUDGMENT LEGAL STANDARD .......... 6

ARGUMENT .......... 7

I. THE RECORD EVIDENCE ESTABLISHES THAT THE COUNTY MADE OVERTIME PAYMENTS IN A TIMELY MANNER .......... 7

A. The Determinants Of The County's Overtime Payroll Schedule .......... 7

B. The County's Overtime Payroll System Had Checks And Balances To Avoid Potential Abuses .......... 8

C. The Pay Periods Were Bi-Weekly, And It Was Impossible To Pay Overtime In The Same Pay Period In Which It Was Worked .......... 9

D. The Plaintiffs Used Paper Overtime Slips, Due To Their Superiors' Opposition To Time Clocks, Leading To The Plaintiffs' Errors And Later Submission Of Overtime Slips .......... 11

E. The County's Analysis Of The Random Sample Shows That In 2014-2020, Most Of The County's Overtime Payments Were Made Within Two Pay Periods .......... 14

F. Since 2020, The County's Modernization Of Its Payroll System Has Resulted In Sooner Overtime Payments .......... 16

II. AS A MATTER OF LAW, THE COUNTY'S PAYMENT OF OVERTIME WAS TIMELY UNDER THE FLSA, PURSUANT TO CASE LAW IN THE SECOND CIRCUIT AND 29 U.S.C. § 778.106, AND THE PLAINTIFFS CANNOT SHOW OTHERWISE .......... 17

A. The FLSA Statute Is Silent On When Overtime Wages Must Be Paid .......... 18

B. Courts In The Second Circuit Have Adopted A Prompt Payment Interpretation Of The FLSA, Allowing Different Overtime Payment Schedules, Depending On When Overtime Pay Is Calculated ........................................18

C. As A Matter Of Law, The County's Payment Of Overtime Was Timely Under The FLSA, And The Plaintiffs Cannot Show Otherwise ........................................20

III. THE PLAINTIFFS ARE NOT ENTITLED TO LIQUIDATED DAMAGES ........................................26

A. The County Demonstrated Subjective Good Faith Compliance ........................................27

B. The County's Compliance Was Objectively Reasonable ........................................28

IV. THE STATUTE OF LIMITATIONS SHOULD BE RESTRICTED TO TWO YEARS ........................................29

V. EDWARD MANGANO, IN HIS OFFICIAL CAPACITY AS COUNTY EXECUTIVE, SHOULD BE DISMISSED FROM THIS ACTION COUNT ........................................30

CONCLUSION ........................................30

CERTIFICATE OF WORD COUNT ........................................

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 106 S. Ct. 2505, 91 L. Ed. 2d 202 ........................................ 6

*Banschback, et al. v. County of Nassau*,
No. 1-CV-6981 (E.D.N.Y. May 25, 2004) ........................................ 27, 29

*Brock v. Wackenhut Corp.*,
662 F. Supp. 1482 (S.D.N.Y. 1987)........................................26, 27

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)........................................ 6

*Cifarelli v. Vill. of Babylon*,
93 F.3d 47 (2d Cir. 1996)........................................ 6

*Edwards v. City of New York*,
No. 08-CV-3134, 2011 WL 3837130 (S.D.N.Y. Aug. 29, 2011)........................................*Passim*

*Fishman v. Cnty. of Nassau*,
No. 10-CV-3231, WL 3919713 (E.D.N.Y. Sept. 7 (2011) ........................................30

*Garcia v. Saigon Mkt. LLC*,
No. 15-CV-9433, 2019 WL 4640260 (S.D.N.Y. Sept. 24, 2019)........................................26

*Lawtone-Bowles v. City of New York*,
No. 16-CV-4240, 2020 WL 2833366 (S.D.N.Y. June 1, 2020) ........................................ 5,17, 22

*Lynch v. City of New York*,
291 F. Supp. 3d 537 (S.D.N.Y. 2018) ........................................ 2, 19, 22

*Meadows v. Planet Aid, Inc.*,
No. 08-CV-2846, 2011 WL 13299923 (E.D.N.Y. July 8, 2011)........................................ 18

*Murray v. City of New York, New York*, *superseded on other grounds*,
No. 16-CV-8072, 2020 WL 615053 (S.D.N.Y. Feb. 10, 2020)........................................ 2, 19, 22

*Nell v. City of New York*,
No. 19-CV-6702, 2021 WL 2716523 (S.D.N.Y. July 1, 2021) ........................................*Passim*

*Parker v. City of New York*,
No. 04-CV-4476, 2008 WL 2066443 (S.D.N.Y. May 13, 2008) ........................................2-3, 19

*Pineda v. Big City Realty Mgmt., LLC,*
No. 22-CV-5428, 2024 WL 5146068 (E.D.N.Y. Dec. 17, 2024) .................................... 18, 20

*Pineda-Herrera v. Da-Ar-Da, Inc.,*
No. 09-CV-5140, 2011 WL 2133825 (E.D.N.Y. May 26, 2011) ...........................................26

*Rogers v. City of Troy, N.Y.,*
148 F.3d 52 (2d Cir. 1998)........................................................................... 2, 3, 18, 19

*Rosenbaum v. Meir,*
658 F. Supp. 3d 140 (E.D.N.Y. 2023) ............................................................................ 18

*Vermont Teddy Bear Co. v. 1-800 Beargram Co.,*
373 F.3d 241 (2d Cir. 2004)............................................................................................ 6

*Worley v. City of New York,*
17-CV-4337, 2020 WL 730326 (S.D.N.Y. 2020)....................................................... 2, 19, 29

**<u>Statutes</u>**

29 U.S.C. § 201, *et. seq*...............................................................................................1

29 U.S.C. § 207.................................................................................................................1

29 U.S.C. §216 ............................................................................................................... 26

29 U.S.C. §255 ............................................................................................................... 29

29 C.F.R. § 778.106 ..................................................................................................*Passim*

Federal Rule of Civil Procedure 56 ............................................................................ 1, 6

The Defendants, the County of Nassau and Edward Mangano, in his official capacity as Nassau County Executive (collectively "the County"), respectfully submit this memorandum of law in support of their summary judgment motion, pursuant to Federal Rule of Civil Procedure 56. As set forth below, there is no genuine dispute as to any material fact, and as a matter of law the County has not violated the Fair Labor Standards Act ("the FLSA"), 29 U.S.C. §§ 207 and 216(b), with respect to the named Plaintiffs and collective action members ("the Plaintiffs"). Therefore, the County is entitled to summary judgment in its favor, and this Court must dismiss this action.

## PRELIMINARY STATEMENT

The Plaintiffs in this collective action are approximately 580 Correction Officers, Correction Corporals, Correction Sergeants, Correction Lieutenants, and Correction Captains (collectively "Correction Officers") currently or formerly employed by the Nassau County Sheriff's Department during the relevant time period, allegedly May 4, 2014 to the present. (**Ex. A,** Compl.; SOMF ¶¶1-5, 156). The Plaintiffs do not dispute that the County paid them *all* of their overtime wages, in compliance with 29 U.S.C. § 207. (**Ex**. **B**, Pltf. Letter, ¶2). Moreover, it is indisputable that the County paid the Plaintiffs their overtime *in excess* of what the FLSA requires, pursuant to the parties' collective bargaining agreement. (**Ex. C**, U.S. Dept. of Labor Letter; SOMF ¶¶10-11).

Yet the Plaintiffs here seek an unearned windfall from this Court. They allege that their overtime wages were supposedly not paid quickly enough under the FLSA, so they should be paid an additional 100% of their already paid overtime wages, in liquidated damages, pursuant to 29 U.S.C. §§ 207 and 216(b). (Ex. A, 8(1)). On the one hand, their Complaint seeks to impose an ironclad, *per se* deadline, that they should have been paid for their earned overtime wages "during the regular pay period in which the work was performed." (*Id.*, ¶42). On the other hand, the

Complaint seeks to impose a contrary, ironclad, *per se se* deadline, that they should have been paid their overtime wages "on the next scheduled payday after the work was performed." (*Id*., ¶44). These contrary allegations defy logic, as one alleged deadline is *during* the period in which overtime work was performed and the other alleged deadline is *after* the overtime work was performed. Be that as it may, the Plaintiffs' claim fails as a matter of law on both allegations, as the FLSA has no *per se* deadline for payment of overtime, and the Plaintiffs' claim fails on the facts, as there is no genuine issue of material fact as to the County's timely payment of overtime under the FLSA. *See Murray v. City of New York, New York*, *superseded on other grounds*, No. 16-CV-8072, 2020 WL 615053, at *14, (S.D.N.Y. Feb. 10, 2020)(no *per se* rule that 35 days is untimely).

First, there is no statutory requirement in the FLSA that overtime wages must be paid within the regular pay period in which the work was performed, or by any deadline. Instead, "the FLSA is silent as to when overtime compensation must be paid." *Edwards v. City of New York,* No. 08-CV-3134, 2011 WL 3837130, at *11 (S.D.N.Y. Aug. 29, 2011). *See Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 55 (2d Cir. 1998)("The Act does not specify *when* this wage must be paid.).

Second, pursuant to the prompt payment requirement developed by courts in the Second Circuit, based on the interpretation of the FLSA by the U.S. Department of Labor ("the DOL"), 29 C.F.R. § 778.106, courts have considered that up to 35 days or longer may be timely payment of overtime wages, depending on the reason for the time to payment. *See Nell v. City of New York*, No. 19-CV-6702, 2021 WL 2716523, at *1 (S.D.N.Y. July 1, 2021)(payment within two pay periods is generally timely; no required deadline for payment made as soon as practicable); *Worley v. City of New York*, 17-CV-4337, 2020 WL 730326 (S.D.N.Y. 2020)(plaintiffs denied summary judgment for claim that payment later than 35 days was untimely); *Lynch v. City of New York*, 291

F. Supp. 3d 537, 552 (S.D.N.Y. 2018)(generally two pay periods or 28 days is timely); *Parker v. City of New York*, No. 04-CV-4476, 2008 WL 2066443, at *1, *10 (S.D.N.Y. May 13, 2008)(21 days was timely; pay could not be calculated before second bi-weekly pay period); *Edwards v. City of New York*, No. 08-CV-3134, 2011 WL 3837130, at *1-*2 (S.D.N.Y. Aug. 29, 2011)(20 days was timely; overtime work in anticipatory week had to be calculated in next pay period); *Rogers v. City of Troy, N.Y.,* 148 F.3d 58 (bi-weekly pay period with one week pay lag could be timely if four factors were satisfied). "[W]hen the correct amount of overtime compensation cannot be determined until some time after the regular pay period," payment is timely if made "as soon after [the] regular pay period as is practicable" and within a period of time "no longer than was reasonably necessary to calculate and arrange for payment." 29 C.F.R. § 778.106.

Here, the record evidence shows that the County could not determine the correct amount of overtime pay during the bi-weekly pay period in which the overtime work was performed, because the overtime pay period ended *before* the overtime hours were processed by the payroll staff and calculated by the County Comptroller's Office ("the Comptroller"). (SOMF ¶62). *See Edwards v. City of New York*, No. 08-CV-3134, 2011 WL 3837130, at *1-*2 (S.D.N.Y. Aug. 29, 2011)(where calculations for correction officers' overtime could not be made before their timesheets were processed, payment made at the end of the second bi-weekly pay period was timely), In fact, the president of the Plaintiffs' own union, who is a Plaintiff in this action, as well as the human resources employee who processed the Plaintiffs' overtime payroll for 17 years, both testified in their depositions that it was *impossible* for the County to pay overtime compensation within the same pay period within which it was worked. (SOMF ¶¶58-60, 68, 85-87, 104).

The record evidence also shows that the County could not determine the correct amount of overtime pay during the Plaintiffs' other bi-weekly pay period, the pay period for regular hours,

which alternated with the overtime pay period, as the Plaintiffs admit. (Ex B, 2, ¶3; SOMF ¶57). Whereas the Plaintiffs' regular hours could be calculated in advance, the Plaintiffs' overtime hours, which were variable from overtime pay period to pay period, could not be calculated in advance and took time to process and calculate. (SOMF ¶¶50, 57, 105). Thus, the bi-weekly paycheck for regular hours could not include overtime hours; the variable overtime hours were paid in a separate check in alternating weeks (¶¶57, 110).

It is also indisputable that the County could not determine the correct amount of the Plaintiffs' bi-weekly overtime compensation by "the next scheduled payday after the work was performed," because the next scheduled payday was a Wednesday, just two days after the end of the bi-weekly overtime pay period, on a Monday, and that payday was for overtime hours worked in the prior pay period. (*see below*, Biweekly Pay Periods Chart). Two days was an insufficient amount of time for the payroll staff to process the overtime hours and insufficient time for the Comptroller to calculate the overtime pay. (SOMF ¶¶57, 60, 62; Grunwald Aff., ¶¶7-14).

Here, the County's overtime payments were made as soon as practicable, and in a period of time no longer than reasonably necessary to calculate and arrange for payment, pursuant to the cases in the Second Circuit cited above and 29 C.F.R. § 778.106. The record evidence shows that between 2014 and 2020, most of the Plaintiffs' overtime payments were paid within 15 to 28 days after the overtime was worked, or within two bi-weekly overtime pay periods, and between 2020 and the present, within 9 to 28 days, depending on when the overtime was worked, which was well within the range of time periods in the above cases, and timely, under the FLSA. (*see below*, Days To Pay Overtime Chart; SOMF ¶¶60, 62, 149-150; Aff., Boniface, ¶¶8, 9). As to the remaining fraction of overtime payments that could not be paid within two pay periods, they were flukes, and it was impracticable to pay them within two pay periods, and reasonably necessary to pay them

within the next pay period, owing to the Plaintiffs' own errors in recording their overtime work, their submission of duplicate overtime records, and their withholding those records, causing later payment. (SOMF ¶¶46-49; 60; 66-69; 98, 118). *See Lawtone-Bowles v. City of New York*, No. 16-CV-4240, 2020 WL 2833366, at *4 (S.D.N.Y. June 1, 2020)(the "high rate of timely payment provides circumstantial support that the untimely payments were flukes, caused by unusual issues that made faster payment 'impracticable.'"). Therefore, these later payments, too, were timely under the FLSA.

Notably, since 2020, the Comptroller has substantially upgraded its payroll system and streamlined its payroll processes with an electronic system, to better ensure compliance with the FLSA and federal regulations, so that the Plaintiffs may now receive their overtime pay sooner than in 2014 to 2020. (Aff. Howard, ¶¶13, 15-16, 23; Aff. Grunwald, ¶¶5, 6, 14).

In sum, the indisputable evidence shows that all of the County's overtime payments have been timely under the FLSA. The Plaintiffs cannot show that payment was not made "as soon after [the] regular pay period as [was] practicable" and within a period of time "longer than was reasonably necessary to calculate and arrange for payment." Therefore, the Plaintiffs' claims must fail and this Court must grant the County's summary judgment motion and dismiss this action.

Further, as a matter of law, since there has been no violation of the FLSA by the County, no liquidated damages are warranted, and as the record evidence shows, the County acted in good faith to comply with the FLSA. (SOMF ¶¶6, 12, 56, 136-139; Aff. Howard, ¶¶15, 23). Finally, since the Plaintiffs cannot establish that the County willfully violated the FLSA, the applicable statute of limitations in this case must be limited to two years.

**RULE 56.1 STATEMENT OF MATERIAL FACTS**

The Court is respectfully referred to the County's Local Rule 56.1 Statement of Material Facts As To Which There Are No Genuine Issues To Be Tried; the supporting evidence in the

Exhibits cited to therein; and the Affidavits of the County's Director of Human Resources, Marisa Howard; the Director of Payroll and Benefits, Michael Grunwald; and Corrections Department Lieutenant Investigator, Michael Boniface.

**SUMMARY JUDGMENT LEGAL STANDARD**

Federal Rule of Civil Procedure 56(a) states that: "[a] party may move for summary judgment, identifying each claim or defense…on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment…" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). "Once a movant has demonstrated that no material facts are in dispute, the non-movant must set forth specific facts indicating a genuine issue for trial exists in order to avoid the granting of summary judgment." *Cifarelli v. Vill. of Babylon,* 93 F.3d 47, 51 (2d Cir. 1996). "In reviewing a summary judgment motion, [the court] must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004). "[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. *Cifarelli,* 93 F.3d 51. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment...against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*

## ARGUMENT

## I. THE RECORD EVIDENCE ESTABLISHES THAT THE COUNTY MADE OVERTIME PAYMENTS IN A TIMELY MANNER

### A. The Determinants Of The County's Overtime Payroll Schedule

During the relevant time period of this action, there have been various determinants of the County's overall payroll schedule for Correction Officers' overtime pay: the County's system of checks and balances to avoid potential abuses of overtime payment; the Correction Officers' continued use of paper overtime slips to manually record their overtime work due to high-ranking Correction Officers' opposition to the use of electronic timekeeping; the time required for the payroll staff's manual entry and processing of the information from the paper overtime slips; the Comptroller's procedures to audit and calculate overtime pay and process payment; and importantly, the use of bi-weekly overtime pay periods for which overtime pay could not be calculated in advance, since overtime hours were variable from pay period to pay period, unlike regular work hours, which were predictable, and paid on the assumption that the same number of regular hours was worked each bi-weekly pay period. (SOMF ¶¶50, 57-62; 73-76; 103, 106; Aff. Howard, ¶¶9, 11-12; Aff. Boniface: ¶¶7, 10-15; Aff. Grunwald, ¶¶7-14). (Indeed, in the Corrections Department, which includes a jail, overtime hours could increase unexpectedly, such as with an unpredictable occurrence of an incident resulting in a "shakedown." (SOMF ¶¶25, 43, 76, 98)). The deadline for the Plaintiffs to submit their overtime slips to the payroll staff was *after* the end of the bi-weekly pay period in which the overtime was worked, and it took several days to manually enter and process the information from the paper overtime slips. (SOMF ¶57). Between 2014 and 2020, the Comptroller required an additional 15 days to review and audit the overtime data, initiate the calculations for payment, and issue the overtime checks. (SOMF ¶¶57, 62; Aff. Grunwald, 7-13). Since 2020, the County has modernized its payroll system, and the Comptroller

may now issue the overtime checks sooner, within 8 days of the time it picks up the bi-weekly overtime entries from the Corrections Department. (Aff. Grunwald, ¶¶5-14).

**B. The County's Overtime Payroll System**
**Had Checks And Balances To Avoid Potential Abuses**

During the relevant time period, the County used a system of multiple checks and balances in the approval, processing and payment of Correction Officers' overtime work to avoid potential abuses of overtime, which is especially important in the paper-driven system preferred by the Correction Officers. (Aff. Howard, ¶¶7-12; SOMF ¶69). The use of a system with checks and balances on overtime pay is part of the County's duty to taxpayers to maintain the County budget, exercise fiscal prudence and comply with the State and the Nassau Interim Finance Authority's financial restraints. (Aff. Howard, ¶11). The checks and balances have included multiple steps in the overtime approval and certification process. (*Id.*; Aff. Howard, ¶12). During the relevant time period, the County eliminated certain steps in the overtime approval and certification process to streamline the process, in order to pay overtime sooner and ensure compliance with the FLSA and federal regulations. (*Id.* ¶¶13-15). In addition, during the relevant time period, the County devoted substantial resources to major upgrades of its payroll processing system, from the paper-based Nassau Unified Human Resources System ("NUHRS") to the PeopleSoft electronic system ("PeopleSoft"), to further improve and streamline the overtime payment process. (**Ex. D**, Contract; *Id.* 23; Aff. Grunwald ¶¶5, 6, 11). For Correction Officers, the steps in the approval and certification process for overtime can be divided into three areas: first, the authorization, recording, and verification of their overtime work within the Corrections Department and the review of their overtime records ("overtime slips") by higher ranking officers and officials (SOMF ¶¶33-49, 92-94; Aff. Boniface, ¶¶10-14); second, the review, manual entry and processing of the information from the overtime slips by the Human Resources Unit ("HR") of the Sheriff's Department (SOMF

¶¶57-70; Aff. Boniface, ¶¶15-20); and third, the auditing, calculation and processing of overtime payment by the Comptroller. (SOMF ¶¶57, 60-61; 140; Aff. Grunwald ¶¶7-13).

**C. The Pay Periods Were Bi-Weekly, And It Was Impossible To Pay Overtime In The Same Pay Period In Which It Was Worked**

The Comptroller paid the Correction Officers their regular pay bi-weekly, in one check, and their overtime pay bi-weekly in the alternating weeks, in a separate check. (SOMF ¶¶57, 103, 110, 163-164; Aff. Boniface ¶¶7-8). Thus, the regular pay periods and the overtime pay periods were not in sync. Regular hours were paid every two weeks, and calculated in advance, based on the assumption that all scheduled hours were worked. (SOMF ¶¶50, 105). However, overtime hours, which were not regular, and which could vary from pay period to pay period, had to be entered into a computer manually by HR staff from the Correction Officers' paper overtime slips, which took several days. (*Id.* ¶¶50, 57). Before the overtime hours could be entered by the HR staff, the overtime slips had to be filled out by the Correction Officers and approved by their supervisors, then delivered to HR. (*Id*. ¶¶50, 57, 63, 93). One or two HR employees would then review the overtime slips and manually enter the information for about 3,000 overtime slips per bi-weekly overtime pay period into a computer. (*Id*. ¶59). The bi-weekly pay period ended on a Monday. (*Id*. ¶57). The deadline for the submission of the overtime slips to HR was the next day, Tuesday, after the end of the pay period on Monday, although slips submitted Wednesday could still be processed. (*Id*. ¶¶57, 62, 64). The deadline for the HR employees to finish processing the information from the overtime slips was Thursday evening, for HR's submission of the overtime data to the Comptroller. (*Id.* ¶¶57, 62). Between 2014 and 2020, the Comptroller would issue the overtime checks 15 days after the Tuesday HR deadline, on a Wednesday. (SOMF ¶57). The bi-weekly pay periods and deadlines from 2014 to 2020 are illustrated in the chart below, based on the deposition testimony of Susan Hembach ("Hembach"), a Correction Officer who processed

overtime slips in HR for 17 years. (SOMF ¶¶57-62).

**Chart of Bi-Weekly Pay Periods and Overtime Payments 2014-2020**

| Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|
| **Day 14 - End of prior OT pay period.** | **Day 1 – of 1st OT pay period.** | **Day 2 – of 1st OT pay period.** | **Day 3 – of 1st OT pay period.** | **Day 4 – of 1st OT pay period.** | **Day 5- of 1st OT pay period.** | **Day 6 – of 1st OT pay period.** |
| **Day 7 – of 1st OT pay period.** | **Day 8 – of 1st OT pay period.** | **Day 9 – of 1st OT pay period. Regular Paycheck** | **Day 10 – of 1st OT pay period.** | **Day 11 – of 1st OT pay period.** | **Day 12- of 1st OT pay period.** | **Day 13 – of 1st OT pay period.** |
| **Day 14 – End of 1st OT pay period.** | **Day 1 – of 2d OT pay period. Deadline for 1st OT pay period slips to HR, slips processed.** | **Day 2- of 2d OT pay period. 1st OT pay period slips processed by HR. Prior OT pay period paycheck** | **Day 3- of 2d OT pay period. Deadline, 1st OT period data to Comptroller.** | **Day 4- of 2d OT pay period. Comptroller reviews OT data with HR, runs report, checks for duplicates** | **Day 5 - of 2d OT pay period. Comptroller processes OT (audits OT data, initiates calculations, etc.)** | **Day 6 - of 2d OT pay period Comptroller processes OT.** |
| **Day 7- of 2d OT pay period. Comptroller processes OT.** | **Day 8 - of 2d OT pay period. Comptroller processes OT.** | **Day 9- of 2d OT pay period. Comptroller processes OT. Regular Paycheck.** | **Day 10- of 2d OT pay period. Comptroller processes OT.** | **Day 11- of 2d OT pay period. Comptroller processes OT.** | **Day 12- of 2d OT pay period. Comptroller processes OT.** | **Day 13- of 2d OT pay period. Comptroller processes OT.** |
| **Day 14- End of 2d OT pay period.** | **Day 1-** | **Day 2 OT Paycheck for 1st pay period, 15 days after deadline to submit 1st OT pay period slips to HR** | **Day 4-** | **Day 5-** | **Day 6-** | **Day 7-** |

Since the pay period was biweekly and it ended on a Monday *before* the deadline for the overtime slips to be collected and processed by HR from Tuesday to Thursday, it was impossible to pay the Correction Officers' overtime within the same overtime pay period within which the work was done. (SOMF ¶¶57, 62-63, 99, 103). In fact, the president of the Plaintiffs' own union,

a Plaintiff in this action, as well as Hembach, both testified in their depositions that it was "impossible" to pay overtime within the same pay period it was worked. (SOMF ¶¶63, 99). Instead, from 2014 to 2020, most overtime was paid at the end of the second bi-weekly pay period, within 15-28 days after it was worked, and between 2020 and the present, within 9-28 days after the overtime was worked, depending on when the overtime was worked. (*see below* Days To Pay Overtime Charts; Aff. Boniface, ¶¶8-9; SOMF ¶57). Hembach testified that at times, overtime slips were delivered to HR after the Tuesday HR deadline but they would still be processed by HR in time for the Comptroller's deadline. (SOMF ¶¶62, 64 For example, Hembach testified at her deposition that most of the time Sheriff Michael Sposato ("Sposato"), whose term as Sheriff included 2014 to 2017, returned the overtime slips to her on Wednesday after he reviewed them and the slips were processed in time by Thursday. (SOMF ¶¶22, 62, 64).

Since the County's modernization of its payroll system in 2020, the Comptroller may now issue the Plaintiffs' overtime checks sooner, within 8 days from the time the Comptroller picks up the bi-weekly overtime entries from the Corrections Department, depending on when the entries are completed. (SOMF, ¶62; Aff. Grunwald ¶¶5, 6, 14). Thus, the County's modernization process has shortened the time to overtime payment by the Comptroller by about one week.

### D. The Plaintiffs Used Paper Overtime Slips, Due To Their Superiors' Opposition To Time Clocks, Leading To the Plaintiffs' Errors And Later Submission Of Overtime Slips

Between 2014 and the present, Correction Officers have persisted in recording their overtime hours manually, on paper overtime slips, rather than electronically, due to their superiors' opposition to time clocks. (**Ex. E**, Sample Overtime Slip; SOMF ¶¶76-81, 93, 103, 109; Aff. Boniface ¶¶10-12). Although in or about 2016 the County wanted to move away from paper overtime slips and took steps to implement a new electronic timekeeping system and install time clocks for Correction Officers, a lot of Corrections Supervisors and Captains objected to using the

new timekeeping system for practical reasons. (SOMF ¶¶71-76; Aff. Boniface, ¶¶10-12). So time clocks were never used by the Correction Officers. (SOMF ¶96; Boniface, ¶11 )

The paper overtime slips required a lot of information to be written in by hand, including the name and signature of the Supervisor who authorized the overtime; the Correction Officer's name and signature, the date and overtime hours worked; the work performed, the necessity of the work, the platoon number, post assignment and name of the person relieved, whether the overtime was for meal relief; and the name and signature of the Supervisor who verified the overtime was worked. (Ex. E; SOMF ¶¶35, 46). Given the quantity of handwritten information required on the paper overtime slips, it is not surprising that a lot of mistakes were made, requiring that the physical slips be returned or mailed to the Correction Officers for correction, which would have caused the overtime slips to be processed for payroll at a later time. (SOMF ¶¶46, 68-69, 98).

Sheriff Sposato testified at his deposition that:

> I would compare some of the slips to [the] actual...line up to make sure that post was needed. A lot of times it was missing a supervisor's signature. It was missing on the back on why they worked and who they replaced... the goal wasn't to not to pay people. The goal was to make sure they were writing -- filling out the slip correctly...A lot of times they were missing signatures, it wasn't authorized, it wasn't requested...Mistakes. A guy might work Friday, Saturday, Sunday or Monday, Tuesday, Wednesday and get them requested but not authorized. The verification had to be done...
>
> (SOMF ¶46).

Hembach testified at her deposition that:

> It could be, well, you didn't request comp time…so that's why you didn't get paid…sometimes, it could have popped up as a duplicate. They might have put the wrong date, and I said, no, you put two slips for that date. A lot of times with our checks and balances within the unit, we could catch that early and get in touch with unit to say oh, Officer John Doe has two slips for this day, can you straighten this out, if we had the time…Then those slips would get mailed back to the officer.
>
> (SOMF ¶69).

As for the present, the Plaintiffs' own union president, who is a Plaintiff in this action,

testified in his deposition that: "[e]verything at the jail is done with paper and pencil at this late stage of the game. Mistakes are made..." (SOMF ¶98). Investigator Lieutenant Michael Boniface ("Boniface"), who currently supervises HR, testified in his affidavit that he is unaware of complaints about untimely payment of overtime, *except when payment takes longer, due to the Correction Officers having to correct their overtime slips*. (Aff. Boniface, ¶20).

If electronic timekeeping and time clocks had been installed for Correction Officers, as the County wanted, it is likely that fewer errors would have been made than with paper overtime slips filled out by hand, since more information would have been recorded automatically, and there would have been less need to return or mail back the incorrect or incomplete, physical overtime slips for correction, which had impeded the payroll process.

Another impediment to the payroll process was the practice of some Corrections Units and Correction Officers to hold onto their overtime slips, which would delay the time of payment if the bi-weekly deadline for submission of the slips to HR was missed. (SOMF ¶¶47-49, 67, 118). Sheriff Sposato testified at his deposition that "a lot of times" the Correction Officers did not hand in their overtime slips "on time...we found that a lot of Correction Officers hold their overtime slip…they would get it all filled out and take ten of them home, hold them and then give them a month later because they wanted to average out their overtime. I always had an issue with that." (SOMF ¶48). Sheriff Sposato explained further:

> Some guys would work on a Thursday, go on vacation for four days and when he came back, he put his slip in…I could tell because when I got them, I would see …nine slips. You can't work nine slips yesterday, so I would know that that guy was holding his slips...A lot of my slips the people could hold them…and hold them…I was getting people's slips who worked weeks prior. People put in slips late and knew they were going to get paid late because they put it in late, so I'm not sure what the case is. Maybe these are people that didn't like that I kicked their slip back because it was wrong, but, again, no one gets unpaid.
>
> (SOMF ¶49).

Similarly, Hembach testified at her deposition that sometimes Correction Officers would hold back their overtime slips "so they could get a bunch of overtime at once." (SOMF ¶67). She also testified that at times the Correction Officers' Units were late in handing in the overtime slips to her and some units were always late with their slips "because you had a supervisor who just didn't think anything of it, so some units, like medical, you're always late with your slips." (SOMF ¶¶65-66).

In sum, the superior Correction Officers' preferred, continued use of paper overtime slips, which had a lot of errors, requiring added time for correction and return of the slips, and the holding of the overtime slips by Correction Officers, led to delays in the submission of overtime slips for payroll processing, and was caused by the Correction Officers themselves. Their delays beyond the bi-weekly deadline for submission of the slips to HR led to payment later than two pay periods after the overtime work, and explains the flukes, the fraction of overtime payments that had to be paid later than 28 days. These delays were beyond the County's control.

### E. The County's Analysis Of The Random Sample Shows That In 2014 To 2020, Most Of The Overtime Payments Were Made Within Two Pay Periods

In this action, the parties agreed to use a random sample of approximately 10% of the Plaintiffs and a sample of four months in each of three years, 2014, 2017, and 2020, for analysis. (SOMF ¶141). In discovery, the County produced to the Plaintiffs copies of the handwritten paper overtime slips, paper time and leave records and spreadsheet data, for the sample. (*Id.* ¶¶141-145). In its analysis of the sample, the County differentiated between contract overtime hours and FLSA overtime hours. (*Id.* ¶146). The County determined that between 2014 and 2020, 89.3% of the Plaintiffs in the sample were paid their FLSA overtime wages within 15 to 28 days, as shown in the chart below. (*Id.*). The County determined further that for the Plaintiffs who worked in security platoons (about 60% of the Plaintiffs) with a 15-day work period pursuant to the FLSA's § 207(k) partial overtime exemption for public agency employees engaged in law enforcement, 92.1% of

their overtime payments were made within 16 to 30 days, as also shown below. *(Id.* ¶147).

**Days To Pay Overtime, Entire Sample of Plaintiffs, 2014-2020**

| No. of Overtime Entries | Time to Payment | Percent of Entries[1] |
|---|---|---|
| 0 | 0-14 days to pay | 0% |
| 1368 | 15-28 days to pay | 89.3% |
| 151 | 29-42 days to pay | 9.9% |
| 0 | 43-56 days to pay | 0% |
| 2 | 57-70 days to pay | .1% |
| 12 | 71+ days to pay | .7% |
| Total entries: 1,533 | | Total: 100% |

**Days To Pay Overtime, Security Platoons Only In The Sample, 2014-2020**

| No. of Overtime Entries | Time to Payment | Percent of Entries |
|---|---|---|
| | 0-15 days to pay | |
| 863 | 16-30 days to pay | 92.1% |
| 73 | 31-45 days to pay | 7.8% |
| | 46-60 days to pay | |
| 1 | 61-75 days to pay | .1% |
| | 76+ days to pay | |
| Total entries: 937 | | Total: 100% |

The County concluded that the fraction of FLSA overtime payments made after 28 days, 10.7% of all payments and 7.9% of security platoons' payments, were flukes, owing to the Plaintiffs' own errors and withholding of their overtime records, as supported by the evidence, making sooner payment impracticable, as explained above. As shown in the chart above*,* nearly all of the flukes were paid within the next pay period after the Comptroller calculated the overtime pay.

## F. Since 2020, The County's Modernization Of Its Payroll System Has Resulted in Sooner Overtime Payments

In or about 2009, the Nassau County Legislature authorized the County Executive to enter into a contract with an information technology ("IT") firm to modernize its payroll system. (SOMF

[1] Note that although all FLSA overtime entries in the sample were analyzed, approximately 2% of the entries appeared to be aberrant; 35 entries between March 2020 and April 2020, during the COVID-19 pandemic, had between 24 and 31.75 of overtime hours worked in a single day. These aberrant entries were not included in the above charts.

¶136). The original contract provided for the sum of $21,204,425 to be paid to the IT firm for the modernization project. (*Id*. ¶137). The County provided substantial staff support for the modernization project, including teams from its Office of Human Resources and Payroll Office. (*Id*. ¶138). The County's purposeful modernization of its payroll system streamlined the payroll process, leading to sooner payment of the Plaintiffs' overtime, as documented in the affidavits of the County's present Director of Payroll and Benefits and the Director of Human Resources. (*Id*. 139; Aff. Grunwald, ¶¶5, 6, 14: Aff. Howard, ¶23). Since 2020, the Comptroller has had PeopleSoft, the new payroll system, calculate the overtime compensation for employees. (Aff. Grunwald, ¶¶5, 10). Michael Grunwald, who has served as the County's Director of Payroll and Benefits for the Comptroller since 2009, testified in his affidavit that by October 2020, the County had replaced its paper-based payroll system, NUHRS, with the electronically-based PeopleSoft system ("PeopleSoft"). (*Id*. ¶¶4, 5). County Departments are now required to enter and approve their employees' overtime hours in PeopleSoft by the end of a two-week cycle. (*Id*. ¶7). The Comptroller picks up the data on the employees' overtime hours every two weeks. (*Id*. ¶8). The PeopleSoft entries are audited by the Comptroller as they come in. (*Id*. ¶9). Then, the Comptroller has PeopleSoft calculate the overtime compensation for the employees. (*Id*. ¶10). (Previously, the Comptroller had the paper-based NUHRS system calculate overtime compensation and overtime reports had to be printed out on paper). (*Id*. ¶11). The results are then reviewed for errors by the Comptroller, together with each Department, and adjustments are made as necessary. (*Id*. ¶12). After everything is finalized, the overtime checks are issued to the County employees. (*Id*. ¶13). If a County Department has entered its employees' overtime hours by the end of the two-week cycle, the Comptroller may now pay the employees' overtime compensation in 8 days from the end of the bi-weekly cycle, depending on when the hours are entered. (*Id*. ¶14). Corrections Department Investigator Lieutenant Michael

Boniface, who supervises the Human Resources Unit in the Sheriff's Department, which processes the overtime payroll for Correction Officers, testified in his affidavit that *he is not aware of complaints from Correction Officers about untimely payment of their overtime, except when payment takes longer, due to the Correction Officers having to correct their overtime slips*. (Aff. Boniface, ¶20). Thus, PeopleSoft has streamlined the County's payroll processes for paying overtime compensation.

## II. AS A MATTER OF LAW, THE COUNTY'S PAYMENT OF OVERTIME WAS TIMELY UNDER THE FLSA, PURSUANT TO CASE LAW IN THE SECOND CIRCUIT AND 29 U.S.C. § 778.106, AND THE PLAINTIFFS CANNOT SHOW OTHERWISE

In their Complaint, the Plaintiffs allege that the County violated the FLSA by "failing to pay Plaintiffs all overtime wages owed during the regular pay period in which the work was performed," and contrarily, that the Plaintiffs should have been paid their overtime wages "on the next scheduled payday after the work was performed." (Ex. A, ¶¶42, 44). However, these allegations fail to state or consider the applicable law. Pursuant to the case law in the Second Circuit, which relies on the interpretation of the FLSA in 29 C.F.R. § 778.106, "[w]hen the correct amount of overtime compensation cannot be determined until some time after the regular pay period," payment is timely if made "as soon after [the] regular pay period as is practicable" and within a period of time "no longer than was reasonably necessary to calculate and arrange for payment." 29 C.F.R. § 778.106.; *cited e.g. in Nell v. City of New York,* No. 19-CV-6702, 2021 WL 2716523, at *8 (S.D.N.Y. July 1, 2021); *Lawtone-Bowles v. City of New York,* No. 16-CV-4240, 2020 WL 2833366, at *4 (S.D.N.Y. June 1, 2020). Here, as the record evidence shows, the County could not determine the Plaintiffs' overtime pay until some time after the regular pay period. (SOMF ¶50, 57, 62, 63, 110). However, the County paid the Plaintiffs' overtime as soon as practicable, and in a period of time no longer than reasonably necessary to calculate and issue payment, and the Plaintiffs cannot show otherwise. Therefore, as a matter of law, the County's

overtime payments were timely under the FLSA, and this Court must grant the County's summary judgment motion and dismiss this action.

**A. The FLSA Statute Is Silent On When Overtime Wages Must Be Paid**

It is well settled that the FLSA statute has no deadline by which to make payments for overtime work. *See Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 55 (2d Cir. 1998)("The Act does not specify *when* this wage must be paid."); *accord Pineda v. Big City Realty Mgmt., LLC,* No. 22-CV-5428, 2024 WL 5146068, at *6 (E.D.N.Y. Dec. 17, 2024); *Rosenbaum v. Meir,* 658 F. Supp. 3d 140, 147 (E.D.N.Y. 2023); *Meadows v. Planet Aid, Inc.,* No. 08-CV-2846, 2011 WL 13299923, at *9 (E.D.N.Y. July 8, 2011); *Nell v. City of New York,* No. 19-CV-6702, 2021 WL 2716523, at *8 (S.D.N.Y. July 1, 2021)("[T]here is no required deadline by which to make payments, so long as payment is made as soon as 'practicable.'"); *Edwards v. City of New York*, No. 08-CV-3134, 2011 WL 3837130, at *11 (S.D.N.Y. Aug. 29, 2011)(the FLSA "is silent as to when overtime compensation must be paid").

**B. Courts In The Second Circuit Have Adopted A Prompt Payment Interpretation Of The FLSA, Allowing Different Overtime Payment Schedules, Depending On When Overtime Pay Is Calculated**

Although the FLSA is silent as to when overtime compensation must be paid, "the courts have long interpreted the statute to include a prompt payment requirement." *Rogers v. City of Troy, N.Y.,* 148 F.3d 52, 55 (2d Cir. 1998). In *Rogers,* the Second Circuit did not define "prompt" or set forth a bright line rule to differentiate exactly when an employer's overtime payments are prompt under the FLSA and when they are not. In that case, the Second Circuit held that "[w]hether the prompt payment requirement of the FLSA has been violated must be determined by reference to objective standards."

Since *Rogers,* courts in the Second Circuit have adopted a prompt payment interpretation of the FLSA based on 29 C.F.R. § 778.106, allowing for a range of different overtime payment

schedules that may be timely under the FLSA, when overtime "cannot be determined until some time after the regular pay period," based on the practicability and reasonableness of the time of payment. 29 C.F.R. § 778.106 states:

> There is no requirement in the Act that overtime compensation be paid weekly. The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, *the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable.* Payment *may not be delayed for a period longer than is reasonably necessary* for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

(emphasis added).

In *Nell v. City of New York*, the court, citing *Rogers* and 29 C.F.R. § 778.06, liberally held that "there is no required deadline by which to make payments, so long as payment is made as soon as 'practicable.'" No. 19-CV-6702, 2021 WL 2716523, at *8 (S.D.N.Y. July 1, 2021). Other courts in the Second Circuit have considered that a range of up to 35 days, or longer, is timely under the FLSA, if the overtime compensation is paid as soon after the regular pay period "as is practicable." *See Murray v. City of New York, New York*, *superseded on other grounds*, No. 16-CV-8072, 2020 WL 615053, at *14, (S.D.N.Y. Feb. 10, 2020)(no *per se* rule that 35 days is untimely); *Worley v. City of New York*, 17-CV-4337, 2020 WL 730326 (S.D.N.Y. 2020)(plaintiffs denied summary judgment for claim that payment later than 35 days was untimely); *Lynch v. City of New York*, 291 F. Supp. 3d 537, 552 (S.D.N.Y. 2018)(generally two pay periods or 28 days is timely); *Parker v. City of New York*, No. 04-CV-4476, 2008 WL 2066443, at *1, *10 (S.D.N.Y. May 13, 2008)(21 days was timely where overtime pay could not be calculated before second bi-weekly pay period); *Edwards v. City of New York*, No. 08-CV-3134, 2011 WL 3837130, at *1-*2 (S.D.N.Y. Aug. 29, 2011)(20 days was timely where overtime worked in anticipatory week had to

be calculated in next pay period);

**C. As A Matter Of Law, The County's Payment Of Overtime Was Timely Under The FLSA, And The Plaintiffs Cannot Show Otherwise**

In this action, the record evidence shows that the County could not pay the Plaintiffs' overtime on the regular pay day for the period in which the workweek ended. First, the County paid overtime bi-weekly, not weekly, which is permissible under the FLSA. (SOMF ¶¶57, 110). *See Pineda v. Big City Realty Mgmt.,* LLC, No. 22-CV-5428, 2024 WL 5146068, at *6 (E.D.N.Y. Dec. 17, 2024). ("[F]ailure to pay employees on a weekly basis cannot form the basis of a claim under the FLSA. This is especially true where, as here, plaintiff asserts that defendants did pay his wages promptly, just on a biweekly instead of weekly schedule."). Second, the County could not pay the Plaintiffs by the end of their bi-weekly *regular* pay period, because the regular pay period was not in sync with the biweekly *overtime* pay period, and the paychecks for the regular pay period, which were calculated in advance, alternated with checks for overtime pay, and could not include overtime pay, which was variable. (SOMF ¶¶50, 57, 62, 63, 110). Third, it was impossible to calculate the Plaintiffs' overtime pay by the end of the biweekly pay period in which the overtime was worked, as the record evidence shows that the deadline for the Plaintiffs to submit their overtime slips to HR in the Sheriff's Department was *after* the end of the bi-weekly pay period (*Id*.); it took days to manually enter and process the information from the paper overtime slips (SOMF ¶¶57, 62); and it took an additional 8 to 15 days for the Comptroller to audit the overtime entries, make calculations and arrange for payment of overtime, depending on when the overtime entries were picked up from the Corrections Department (SOMF ¶62; Grunwald, ¶9-10, 14). As cited above, courts in the Second Circuit have held, on similar facts, that payment at the end of the second bi-weekly pay period or later was timely under the FLSA, including where overtime hours were processed after the end of the pay period in which the overtime work was

done.

In *Edwards v. City of New York,* the plaintiffs were correction officers, like the Plaintiffs here. *Edwards*, 2011 WL 3837130, at *1. In *Edwards,* the plaintiffs' timesheets from overtime worked in the second week of their first bi-weekly pay period could not be processed before the end of that pay period, so the plaintiffs were paid the overtime at the end of the second bi-weekly pay period. *Id*. *11. The *Edwards* court held that such payment was timely under the FLSA, because the plaintiffs did not show that the City failed to pay them as soon as practicable or delayed payment longer than was reasonably necessary, and the court denied the plaintiffs' summary judgment motion. *Id.* Similarly, here, the Plaintiffs' overtime hours from their first bi-weekly overtime pay period could not be processed before the end of that pay period, so most of the time, overtime was paid within the second overtime pay period, or within two biweekly pay periods, or less, which was timely under the FLSA. (SOMF ¶57; Aff. Boniface, ¶8). As *in Edwards,* the Plaintiffs here have produced no evidence to show that the County failed to pay them as soon as practicable. Therefore, pursuant to *Edwards,* the County's payment of overtime was timely under the FLSA.

As the record evidence shows, between 2014 and 2020, the fraction of overtime payments the County made after 28 days was paid within the next pay period, except for a minute .7% or .1%. (*see* Days To Pay Overtime Chart, above). Pursuant to *Nell*, which held that "there is no required deadline by which to make payments, so long as payment is made as soon as 'practicable,'" and 29 C.F.R. § 778.106, which states that payment shall "not be delayed beyond the next payday after such computation can be made," these payments were also timely under the FLSA. *Nell*, 2021 WL 2716523, at *8. These later payments were the flukes, and it was impracticable to pay them within two pay periods, and reasonably necessary to pay them within

the next pay period, owing to the Plaintiffs' own errors in recording their overtime work, their submission of duplicate overtime records, and their withholding those records, causing later payment. (SOMF ¶¶46-49. 57, 62, 65-69, 98, 118; Aff. Boniface, ¶20). *See Lawtone-Bowles v. City of New York*, No. 16-CV-4240, 2020 WL 2833366, at *4 (S.D.N.Y. June 1, 2020)(the "high rate of timely payment provides circumstantial support that the untimely payments were flukes, caused by unusual issues that made faster payment 'impracticable.'"); *Lynch v. City of New York*, 291 F. Supp. 3d 537, 552 (S.D.N.Y. 2018) ("[i]ssues that affect the practicability of payment could include both archaic and difficult-to-manage payroll systems; they could also include the failure of plaintiffs to correctly record their own overtime."). Since 2020, the Comptroller has issued overtime payments sooner, reducing the length of time to payment by about one week. (SOMF, ¶62; Aff. Grunwald ¶¶5, 6, 14).

Therefore, all of the County's overtime payments to the Plaintiffs have been timely under the FLSA, because they were paid as soon as practicable, and in a period of time no longer than reasonably necessary to calculate and issue payment, pursuant to the cases in the Second Circuit cited above and 29 C.F.R. § 778.106.

Yet the Plaintiffs' Complaint misstates or misinterprets § 778.106. The Complaint alleges there is an ironclad *per se* rule(s), without exception, that overtime wages must only be paid "during the regular pay period in which the work was performed," or contrarily, "on the next scheduled payday after the work was performed. (Ex. A, ¶¶42, 44). *See Murray v. City of New York, New York*, *superseded on other grounds*, No. 16-CV-8072, 2020 WL 615053, at *14, (S.D.N.Y. Feb. 10, 2020)(no *per se* rule that payment in 35 days is untimely"). The Plaintiffs disregard the text of § 778.106, which allows for a longer time for payment when overtime cannot be calculated by the end of the workweek period.

The Plaintiffs' Complaint disregards or ignores the indisputable facts: that it was impossible to pay the Plaintiffs' overtime *during* the biweekly overtime pay period in which the overtime was worked, because the overtime pay period ended before the overtime hours were entered by the HR staff and calculated by the Comptroller, or *during* the regular pay period, for which regular hours were calculated in advance, and which was out of sync with the overtime pay period, or by the *next payday*, just two days later, for overtime work in the prior bi-weekly overtime period, because two days was insufficient for HR to enter the overtime hours from the overtime slips into the computer and for the Comptroller to calculate payment. (*see* Biweekly Pay Period Chart above).

The Plaintiffs have produced no evidence that the County's payment of their overtime was not "as soon after the regular pay period as [was] practicable" and "longer than was reasonably necessary" for the County "to calculate and arrange for payment." The Plaintiffs did depose a payroll clerk, who complained vaguely that overtime slips went to Sheriff Sposato "for approval" before going back to the payroll clerk "to be processed" and "once the overtime slips went into the sheriff's office, then it became more of an issue and we got them when we got them." (SOMF ¶116). However, at his deposition, when the payroll clerk was asked: "And if you weren't able to get it [the data on the overtime slip from Sheriff Sposato] entered within the end of the pay period, you would make sure that it was entered within the following pay period; is that correct?" the answer was "Yeah." (SOMF ¶117). This exchange actually supports that the overtime slips' information was entered in the computer after the end of the bi-weekly pay period in which the overtime was worked, which was the usual procedure, and confirms that the payroll clerk who received the overtime slips from Sheriff Sposato processed the slips for payment for the second bi-weekly pay period, which was also the usual procedure, and timely under the FLSA. In fact,

Hembach testified that most of the time Sheriff Sposato returned the overtime slips to her on Wednesday and they were processed in time by Thursday. (SOMF ¶64).

In their pre-motion letter to the District Judge Joan M. Azrazk, dated November 13, 2025, DE [99], the Plaintiffs attempt to denigrate Sheriff Sposato for taking the time to review the Plaintiffs' overtime slips. (Ex. B, 1, ¶2; 3, ¶2). However, their attempt is unavailing, because the record evidence shows that Sheriff Sposato reviewed the Plaintiffs' overtime slips for errors, pursuant to the County's policy of fiscal prudence and checks and balances, as did other County officials. (**Ex. F,** Memos; SOMF ¶¶43-46; Aff. Howard, ¶¶9-14). Even before Sheriff Sposato began his term, the Deputy County Executive directed Department Heads to implement procedural controls on time records including checking for original signatures, which is what Sheriff Sposato did. (Ex. F, 1; SOMF ¶46). Further, the County Office of Human Resources was required to randomly select timesheets and/or leave slips to review them for completeness, which is also what Sheriff Sposato did. (*Id*., 2; SOMF ¶¶42, 125). Corrections Department memoranda during the relevant time period show that the overtime slips were required to be submitted for review and approval to the Commissioner of Corrections and Deputy Undersheriffs, not just Sheriff Sposato. (Ex. F, 5-9; SOMF ¶¶41-43). Corrections Commissioner Donahue informed Corrections Captains and other high-ranking Officers, in 2020, that overtime slips not properly filled out were to be returned to staff, which had been Sheriff Sposato's practice too. (SOMF ¶¶45, 131). As the County's Director of Human Resources testified in her affidavit, during the relevant time period, the County used a system of multiple checks and balances in the approval, processing and payment of Correction Officers' overtime work to avoid potential abuse of overtime, which is especially important in the paper-driven system preferred by the Correction Officers, and part of the County's duty to taxpayers to maintain the County budget, exercise fiscal prudence and comply with the

State and Nassau Interim Finance Authority's financial restraints. (Aff. Howard, ¶¶9-12; SOMF ¶¶38, 79). Therefore, Sheriff's Sposato's review of the overtime slips was reasonable and necessary, pursuant to County policy.

The same payroll clerk, who the Plaintiffs relied on in their pre-motion letter to Judge Azrack, testified at his deposition that he never asked why the Correction Officers' overtime slips were going through Sheriff Sposato's office and he "would have no knowledge of why they worked, if they worked," and that he "did not recall any specific Correction Officers who complained to him about overtime payments." (Ex. B, 3, ¶2; SOMF ¶¶120-122). These uninformed and vague statements by the payroll clerk above are insufficient to raise a genuine issue of material fact for the Plaintiffs' allegation that Sheriff Sposato willfully withheld the overtime slips. (Ex. B, 1, ¶2). Moreover, the relevant years of Sheriff Sposato's term, May 4, 2014 to December 31, 2017, included only three and a half years of the alleged relevant time period, May 4, 2014 to the present, a period of more than10 years. (SOMF ¶¶5, 22, 23). Further, as to the current timeliness of overtime payments and the reasons for later payment, Corrections Department Investigator Lieutenant Michael Boniface, who supervises the Human Resources Unit in the Sheriff's Department, which processes the overtime payroll for Correction Officers, testified in his affidavit that *he is not aware of complaints from Correction Officers about untimely payment of their overtime, except when payment takes longer, due to the Correction Officers having to correct their overtime slips*. (Aff. Boniface, ¶20). Therefore, the Plaintiffs' allegation in their pre-motion letter that Sheriff Sposato, somehow, "at all relevant times" intentionally withheld overtime payments is not only unsupported by the record evidence, it is irrational. (Ex. B, ¶1).

In sum, the record evidence shows that the County paid the Plaintiffs' overtime as soon as practicable, and in a period of time no longer than reasonably necessary to calculate and issue

payment, and as a matter of law, pursuant to case law in the Second Circuit and 29 C.F.R. § 778.106, the County's overtime payments were timely under the FLSA. There is no record evidence to show the County did not pay the Plaintiffs' overtime as soon as practicable or that payments took longer than reasonably necessary. Therefore, this Court must grant the County's summary judgment motion and dismiss this action.

**III. THE PLAINTIFFS ARE NOT ENTITLED TO LIQUIDATED DAMAGES,**

Although the record evidence shows the County did not violate the FLSA, if hypothetically, this Court were to find the County liable, liquidated damages should be denied, because the County has demonstrated good faith in complying with the FLSA. Moreover, this Court should not be swayed by the Plaintiffs' extreme demands for alleged liquidated damages, which they have repeatedly asserted, before the issue of liability has been fully considered by this Court, on the merits, on summary judgment.

"The FLSA provides for liquidated damages equal to the unpaid wages due, unless the employer demonstrates to the satisfaction of the Court that it acted in good faith and had reasonable grounds for believing that its actions were lawful." 29 U.S.C. §§ 216(b), 260; *Pineda-Herrera v. Da-Ar-Da, Inc.,* No. 09-CV-5140, 2011 WL 2133825, at *4 (E.D.N.Y. May 26, 2011). "Such damages are not intended to be a penalty or a punishment, but rather, are intended to compensate for any losses a worker might suffer because of the wrongful retention of his pay." *Brock v. Wackenhut Corp.,* 662 F. Supp. 1482, 1487–88 (S.D.N.Y. 1987). "The employer carries the burden of establishing, by plain and substantial evidence, subjective good faith and objective reasonableness." *Garcia v. Saigon Mkt. LLC,* No. 15-CV-9433, 2019 WL 4640260, at *11 (S.D.N.Y. Sept. 24, 2019). "To establish the requisite subjective 'good faith,' an employer must show that it took 'active steps to ascertain the dictates of the FLSA and then act[ed] to comply

with them." *Id*. "If the defendant makes this showing, the Court may in its sound discretion, award no liquidated damages or award any amount thereof not to exceed that authorized by statute." *Brock v. Wackenhut Corp.,* 662 F. Supp. 1482, 1487–88 (S.D.N.Y. 1987).

**A. The County Demonstrated Subjective Good Faith Compliance**

In this action, the indisputable evidence shows that the County has demonstrated subjective good faith by taking active steps to ascertain the requirements of the FLSA and ensure compliance with the FLSA.

Hembach, the Correction Officer who processed overtime slips for 17 years, from 2002 to 2019, in the Human Resources Office of the Sheriff's Department, testified at her deposition that she had FLSA training when she began her job. (SOMF ¶¶54-56). Marisa Howard, the present Director of the County's Office of Human Resources ("HR"), who has served in various high level positions in County HR since 2015, testified in her affidavit that in 2020, she issued a memorandum to all County Department heads, including the head of the Corrections Department, amending the overtime approval and certification process, which was intended to ensure compliance with the FLSA. (Aff. Howard, ¶¶14-15). These facts show that the County had ascertained its FLSA obligations on overtime and took steps to ensure staff compliance.

The County's continuing compliance with the FLSA for its Correction Officers is demonstrated by prior court and agency decisions in the County's favor. For example, in 2004, United States District Judge Denis R. Hurley issued a decision and order, in *Banschback, et al. v. County of Nassau,* an FLSA collective action by the Correction Officers, holding that there was no FLSA violation for a gap time or straight time claim for the Correction Officers' meal periods. No. 1-CV-6981 (E.D.N.Y. May 25, 2004). (**Ex. G**, *Banschback* decision). In 2015, the United States Department of Labor ("the DOL") issued a determination letter to the County's counsel,

concluding that there were "no deficiencies" in the County's overtime payments to its Correction Officers, because the *overtime payments exceeded what was required by §207* of the FLSA. (Ex. C). The DOL letter also stated that the FLSA § 207(k) partial overtime exemption, for public agency employees engaged in law enforcement, was granted to the County for its Correction Officers. (*Id.*) The exemption allowed an extended period of time and/or a higher overtime threshold for Correction Officers to accrue FLSA overtime (15 days and 92 hours for Correction Officers in security platoons and 7 days and 43 hours for Correction Officers in ancillary (support) positions. (*Id.*).

Hembach also testified in her deposition that the County wanted to go to a new electronic timekeeping system, the "PeopleSoft" system, around 2016, and implement time clocks for the Correction Department, which would have facilitated accurate recording of overtime hours. (SOMF ¶¶71-72). Since 2020, the PeopleSoft electronic payroll system has been used by the Comptroller, at considerable expense to the County, to initiate overtime audits and calculations, resulting in sooner payment of overtime. (SOMF ¶137; Aff. Grunwald, ¶¶5-6, 9-11).

These indisputable facts show that the County has demonstrated subjective good faith by taking active steps to ascertain the FLSA's requirements and ensure compliance with the FLSA.

**<u>B. The County's Compliance Was Objectively Reasonable</u>**

Sheriff Sposato testified in his deposition in connection with his review of the Plaintiffs' overtime slips for errors: "the goal wasn't to not pay people" and "no one gets unpaid," evidencing his reasonable belief that the County met its obligations for payment of overtime. (SOMF ¶¶46, 49). Hembach testified that she never experienced someone working overtime and the overtime payments would not be approved and the person would not be paid for overtime work. (SOMF ¶70). The Plaintiffs' collective bargaining agreement ("CBA") with the County entitled them to

overtime premium payment beyond the FLSA's requirements, as documented by the DOL determination letter of March. 23, 2015, which stated that Correction Officers received overtime pay for any work after 8 hours in a day and "the net result of the overtime payments under the CBA resulted in higher payments than what were required by Section 7, *no Section 7 deficiencies existed*." (emphasis added). (Ex. C). Although the DOL letter was issued during the relevant time period of this action, and during Sheriff Sposato's term, there was no indication in the letter that the promptness of overtime payment under the FLSA was an issue for Correction Officers.

Therefore, it was objectively reasonable for the County to believe it had more than met its legal obligations under the FLSA.

## IV. THE STATUTE OF LIMITATIONS SHOULD BE RESTRICTED TO TWO YEARS

Pursuant to 29 U.S.C. §255(a), the FLSA has a two-year statute of limitations, unless a plaintiff shows that a defendant's violation of the FLSA was willful. "To prove a willful violation within the meaning of § 255(a), an employee must establish that the employer either knew or showed reckless disregard for whether its conduct was prohibited by the statute." *Worley v. City of New York,* No. 17-CV-4337, 2020 WL 730326, at *10 (S.D.N.Y. Feb. 12, 2020).

Although in their Complaint, the Plaintiffs allege that "[a]s part of its regular business practice, Defendants intentionally, willfully, and repeatedly engaged in a pattern, practice, and/or policy of violating the FLSA…," there is no evidence in the record of any such County pattern, practice, and/or policy willfully violating the FLSA. Rather, the record evidence shows that over time the County has made it a regular business practice to intentionally comply with the FLSA, and the County did comply. The *Banschback* decision and the DOL determination letter described above were both decided in favor of the County, and dismissed the Correction Officers' claims under the FLSA, including overtime pay claims, evidencing the County's intentional compliance

with the FLSA, which is the opposite of a willful violation. (Ex. C). No. 1-CV-6981 (E.D.N.Y. May 25, 2004). Therefore, this Court should limit the statute of limitations for this action to two years.

## V. EDWARD MANGANO, IN HIS OFFICIAL CAPACITY AS COUNTY EXECUTIVE, SHOULD BE DISMISSED FROM THIS ACTION

The Plaintiffs named former County Executive Edward Mangano ("Mangano") as a Defendant in this action in his official capacity. However, "[a] suit against an officer is his official capacity is essentially a suit against the government entity itself." *Fishman v. Cnty. of Nassau,* No. 10-CV-3231, 2011 WL 3919713, at *6–7 (E.D.N.Y. Sept. 7, 2011)(dismissing the claim against "Mangano in his official capacity" as "duplicative" of the claim against Nassau County). Therefore, Mangano, in his official capacity, should be dismissed from this action.

## CONCLUSION

For the foregoing reasons, the Defendants respectfully request that this Court grant their Summary Judgment Motion in its entirety, and dismiss this action, and grant such other and further relief as this Court deems just and proper.

Dated: Mineola, New York
February 4, 2026

**Bee Ready Law Group, LLP**

By: *Rhoda Y. Andors*
Rhoda Y. Andors, Esq.
*Attorneys for Defendants*
170 Old Country Road, Ste. 200
Mineola, New York 11501
T. 516-746-5599, F. 516-746-1405
randors@beereadylaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK** **Docket No. 17-cv-02721(JMA)(SIL)**
---------------------------------------------------------------------X
**SHAWN BURNS, KEVIN BIEN, and**
**BRIAN M. WISE, and all other similarly situated**
**Correction Officers,**

**Plaintiffs,**

**-against-**

**COUNTY OF NASSAU and EDWARD MANGANO,**
**in his Official Capacity,**

**Defendants.**
---------------------------------------------------------------------X

**<u>CERTIFICATION OF WORD COUNT</u>**
**<u>IN COMPLIANCE WITH RULE 7.1(C) OF THE LOCAL RULES</u>**
**<u>OF THE SOUTHERN AND EASTERN DISTRICTS OF NEW YORK</u>**

I hereby certify that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. The total number of words in this document, inclusive of footnotes, and exclusive of the caption, cover, Table of Authorities, Table of Contents and signature block, is 10,281 words (or 30 pages, by permission of this Court).

Dated: Mineola, New York
February 4, 2026

**Bee Ready Law Group, LLP**

By: /s/ Rhoda Y. Andors
Rhoda Y. Andors, Esq.
*Attorneys for Defendants*
170 Old Country Road, Suite 200
Mineola, NY 11510
Tel. (516) 746-5599
Fax: (516) 746-1045
randors@beereadylaw.com